**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROCK RIVER COMMUNICATIONS, INC., | No. 11-57168 |
| *Plaintiff-Appellant*, | |
| | D.C. No. 2:08-cv-00635-CAS-AJW |
| v. | |
| UNIVERSAL MUSIC GROUP, INC.; UMG RECORDINGS, INC.; UNIVERSAL MUSIC GROUP, INTERNATIONAL, LTD., | |
| *Defendants-Appellees*. | |

| | |
|---|---|
| ROCK RIVER COMMUNICATIONS, INC., | No. 12-55180 |
| *Plaintiff-Appellee*, | |
| | D.C. No. 2:08-cv-00635-CAS-AJW |
| v. | |
| UNIVERSAL MUSIC GROUP, INC.; UMG RECORDINGS, INC.; UNIVERSAL MUSIC GROUP, INTERNATIONAL, LTD., | OPINION |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
May 9, 2013—Pasadena, California

Filed September 18, 2013

Before:  Harry Pregerson and Raymond C. Fisher, Circuit
Judges, and Wiley Y. Daniel, District Judge.*

Opinion by Judge Fisher

**SUMMARY**[**]

**California Tort Law**

The panel affirmed in part and reversed in part the district court's judgment in favor of the defendants and remanded for trial a case concerning the licensing rights for several musical recordings by Bob Marley and the Wailers.

The panel reversed the district court's grant of summary judgment on a claim for intentional interference with prospective economic advantage under California law, alleging that the defendants inappropriately blocked the plaintiff from distributing its album of Marley remixes by wrongfully threatening to sue the plaintiff's distributors. The panel held that, although there can be no liability for

---

[*] The Honorable Wiley Y. Daniel, Senior United States District Judge for the District of Colorado, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

interfering with a business expectancy that is invalid or illegal, the defendant has the burden to prove the invalidity or illegality of the business expectancy as an affirmative defense. The panel held that the defendants could not obtain summary judgment based on holes in the plaintiff's claim to a valid license when the value of the defendants' own licensing rights was equally spotty.

The panel affirmed the district court's holding that triable issues of fact prevented summary adjudication of a *Noerr-Pennington* defense, under which pre-litigation material is immune from suit unless the threatened lawsuit was a "sham."

The panel also affirmed the district court's ruling that the defendants did not implicitly waive privilege over their attorney-client communications.

### COUNSEL

Donald Manwell Falk (argued), Mayer Brown, LLP, Palo Alto, California; Maxwell Blecher and Courtney A. Palko, Blecher & Collins, P.C., Los Angeles, California, for Plaintiff/Appellant/Cross-Appellee.

Kelly M. Klaus (argued), David C. Dinielli and Benjamin J. Maro, Munger, Tolles & Olson LLP, Los Angeles, California, for Defendants/Appellees/Cross-Appellants.

**OPINION**

FISHER, Circuit Judge:

This case concerns the licensing rights for several early musical recordings by reggae legends Bob Marley and the Wailers. When the music was initially recorded in Jamaica in the 1960s, record keeping was not a primary concern. The absence of legal documentation has led to confusion in the marketplace as to which entities own licensing rights for these recordings.

Defendants Universal Music Group, Inc., UMG Recordings, Inc. and Universal Music Group International, Ltd. (collectively, UMG) successfully invoked this lack of documentation in the district court to obtain summary judgment on plaintiff Rock River Communications, Inc.'s (Rock River) claim for intentional interference with prospective economic advantage. Rock River's lawsuit alleged that UMG inappropriately blocked Rock River from distributing its album of Marley remixes by wrongfully threatening to sue Rock River's distributors. UMG persuaded the district court that unless Rock River had proof that its chain of licensing rights was valid – dating all the way back to the initial musicians and producers – then UMG could not be liable, because there is no liability for interference with an *invalid* business expectancy.

UMG is only half right. Although there can be no liability for interfering with a business expectancy that is invalid or illegal, the defendant has the burden to prove the invalidity or illegality of the business expectancy. UMG cannot obtain summary judgment based on the holes in Rock River's claim to a valid license when the validity of UMG's

own licensing rights is equally spotty.  We therefore reverse the grant of summary judgment and remand for trial.  We also reject UMG's argument that we should affirm the district court's grant of summary judgment on the alternative basis of *Noerr-Pennington* immunity.

## I.  Factual Background

Rock River is a producer, seller and distributor of music records.  In 2006, Rock River entered into a licensing agreement with San Juan Music Group, Ltd. (San Juan), whereby San Juan, in exchange for a licensing fee, granted Rock River a nonexclusive license to "sample" or "interpolate" 16 musical recordings (the Recordings) performed by Bob Marley and the Wailers (Marley).  San Juan is a music licensing company that, since 1980, has been licensing recordings by Marley through an agreement with Lee Perry, the producer of many of Marley's early recordings.

Rock River invested its time and creativity into creating new remixes of the Recordings (the Remixes), and it registered copyrights for the Remixes.  Rock River partnered with an independent record label and created an album called "Roots, Rock, Remixed" that included 12 of the Remixes.  Rock River secured digital distribution of the album on iTunes and distribution of physical albums in stores.  Rock River also had plans with Relativity Media to use one of the Remixes – a remix of the song "Lively Up Yourself" – in the "Dear John" motion picture and soundtrack.  At this time, Rock River was unaware that San Juan's authority to license the Recordings was disputed by any entity.

In October 2007, however, UMG sent a cease-and-desist letter to Rock River claiming that UMG owned *exclusive* licensing rights to all the Recordings remixed on the album "Roots, Rock, Remixed" and that Rock River therefore could not release its album without a license from UMG. UMG, the largest record company in the world, claimed to have purchased the exclusive licensing rights from a company called JAD Records in 2003. UMG also began calling and sending letters to Rock River's business partners asserting that Rock River's album violated UMG's exclusive licensing rights to the Recordings:

(1)     UMG sent a letter to Apple requesting that Apple remove the album from the iTunes store within seven days. The letter referred to previous phone calls to the same effect.

(2)     UMG threatened to sue Relativity if it used Rock River's remix of "Lively Up Yourself" in the "Dear John" film or soundtrack without licensing it from UMG.

(3)     UMG instructed Rock River's distributer, Fontana (a subsidiary of UMG), to stop distributing physical copies of Rock River's album.

(4)     UMG urged EMI Music Group to withdraw from negotiations with Rock River to distribute the album outside of North America.

As a result of these letters and phone calls, Relativity decided not to use "Lively Up Yourself" in the "Dear John" film and soundtrack, Apple pulled "Roots, Rock, Remixed" from the

iTunes store and Rock River's distributors ceased distribution of the album.

## II.  Procedural Background

In January 2008, Rock River sued UMG for wrongfully disrupting Rock River's efforts to make money from its album of Remixes by falsely claiming to own exclusive licensing rights to the Recordings.  The district court dismissed Rock River's first few pleading attempts under the *Noerr-Pennington* doctrine,[1] but after the district court permitted limited discovery, Rock River was able to survive UMG's motions to dismiss.[2]  The operative complaint alleged violations of the Sherman Act, 15 U.S.C. § 2, and the Clayton Act, 15 U.S.C. § 18, intentional interference with contract, intentional interference with prospective economic advantage (IIPEA) and misrepresentation in violation of 17 U.S.C. § 512(f).  On UMG's first motion for summary judgment, the district court dismissed all of Rock River's claims except for its IIPEA claim.

---

[1] The *Noerr-Pennington* doctrine, originally derived from the decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), provides that litigation activity (including pre-litigation cease-and-desist letters) cannot form the basis of liability unless the litigation is a "sham."  *See Or. Natural Res. Council v. Mohla*, 944 F.2d 531, 534 (9th Cir. 1991); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939–40 (9th Cir. 2006).

[2] Based on the fruits of its limited discovery, Rock River alleged facts specific enough to satisfy the district court that triable issues existed on whether UMG sent its cease-and-desist letters in bad faith, such that the litigation threatened by UMG in those letters was a "sham."

As the parties prepared for trial on the one remaining claim, UMG used its motions in limine to pursue the following theory: (1) as part of its case-in-chief, Rock River was required to prove that its business expectancy was "valid" – in other words, Rock River had to prove it was legally authorized to use all of the music on its album; (2) if San Juan did not have the right to license one or more of the Recordings, then its attempt to license such Recording to Rock River was invalid; and (3) thus, if San Juan did not have licensing rights for all the Recordings, then Rock River's use of the Recordings was unauthorized by law, Rock River had no right to distribute its album, and Rock River lacked a lawful business expectancy with which UMG could have interfered. In short, UMG argued it cannot be held liable for interfering with an illegal business expectancy, such as album sales of an album that violates copyright law. The ingenuity of this theory, although we ultimately reject it, is that it seeks to allow UMG to prevail without requiring UMG to actually establish that Rock River's album infringed on anyone's licensing rights. Instead, it casts the licensing rights issue as an essential part of Rock River's case-in-chief.

For nine of the tracks on Rock River's album, Rock River proffered evidence directly supporting its claim that San Juan obtained licensing rights from Lee Perry, the original producer of the Recordings. For the other three tracks (the "Three Tracks"), Rock River could not uncover any documents directly illustrating how San Juan obtained the right to license the Recordings. Rock River's position is that San Juan obtained a nonexclusive right to license the Three Tracks through an oral licensing agreement between San Juan and Lee Perry. But on UMG's motion, the district court excluded as hearsay the testimony of San Juan's current president, Michael Chernow, who planned to testify that his

father, now deceased, told him of a conversation with Lee Perry where the oral license agreement took place.

With the exclusion of this evidence, the district court held that Rock River had *no* evidence that San Juan was authorized to license the Three Tracks; therefore, Rock River had no evidence that it was legally authorized to distribute its album as a whole; and thus, Rock River did not have a valid, legal business expectancy with which UMG could have tortiously interfered. The district court invited UMG to file a second motion for summary judgment on this ground, which the district court granted. Rock River filed a motion for reconsideration, which the district court denied. The district court then entered judgment for UMG, but exercised its discretion not to award UMG its costs as prevailing party. Both sides timely appealed.

### III.  Standard of Review

We review de novo the district court's grant of summary judgment. *See Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011).

### IV.  Discussion

### A.  Intentional Interference with Prospective Economic Advantage

UMG moved for summary judgment on the theory that Rock River lacked admissible evidence to support each element of its IIPEA claim. The district court agreed and granted summary judgment on this basis. Thus, our analysis begins with a determination of what elements constitute an IIPEA claim under California law.

To prevail on an IIPEA claim in California, the plaintiff must prove the following elements:

1)  The plaintiff and a third party were in an economic relationship that probably would have resulted in an economic benefit to the plaintiff;

2)  The defendant knew of the relationship;

3)  The defendant intended to disrupt the relationship;

4)  The defendant engaged in wrongful conduct;

5)  The relationship was disrupted;

6)  The plaintiff was harmed; and

7)  The defendant's wrongful conduct was a substantial factor in causing the plaintiff's harm.

Judicial Council of California Civil Jury Instructions (CACI) No. 2202.  UMG argues that IIPEA claims also require proof of an additional element: the validity or legality of the plaintiff's business expectancy.  We hold that this is not an element of an IIPEA claim.  Rather, the *illegality* of the expectancy is an affirmative defense that must be pled and proved by the defendant.

Neither the California Supreme Court nor the California Judicial Council nor the leading treatise on California law

requires a plaintiff to prove the validity of his expectancy as part of his case-in-chief. *See PG&E Co. v. Bear Stearns & Co.*, 791 P.2d 587, 590 n.2 (Cal. 1990) (listing elements for IIPEA claims in California); CACI No. 2202 (same); B.E. Witkin, Summary of California Law, *Torts* § 742 (10th ed. 2012 supp.) (same). UMG's argument for the additional element relies primarily on *Steinberg Moorad & Dunn, Inc. v. Dunn*, No. CV 01-07009, 2002 WL 31968234 (C.D. Cal. Dec. 26, 2002). *Steinberg*, an unpublished district court opinion, which discussed both an IIPEA claim and an intentional interference with contract claim under California law, stated that the interference claims required "[t]he existence of a valid contract *or* economic relationship between plaintiff and the third party." 2002 WL 31968234, at *24 (emphasis added). The court listed the elements from *Ramona Manor Convalescent Hospital v. Care Enterprises*, 225 Cal. Rptr. 120, 124 (Ct. App. 1986), which also discussed both IIPEA claims and intentional interference with contract claims. For the *contract* claim, *Ramona Manor* noted that the plaintiff had to establish a "valid" contract. *See id*. But *Ramona Manor* did *not* require the plaintiff to prove a valid or legal business expectancy for the IIPEA claim. *See id*. Therefore, *Steinberg* did not add an extra element. Rather, discussing both IIPEA claims and intentional interference with contract claims, it simply acknowledged that the contract claim required a "valid contract" and the IIPEA claim required an "economic relationship between plaintiff and the third party." 2002 WL 31968234, at *24. Thus, the California state cases are in accord that the validity and legality of the expectancy are not elements that must be proved by the plaintiff.

To be clear, a plaintiff cannot prevail on an IIPEA claim if its business expectancy is, in fact, unlawful. *See*

Restatement (Second) of Torts § 774 (1979) ("One who . . . causes the nonperformance of an illegal agreement or an agreement having a purpose or effect in violation of an established public policy is not liable for pecuniary harm resulting from the nonperformance."). But the burden of proving such unlawfulness rests on the party alleging illegality. Both California and federal law assume that people act lawfully unless proven otherwise. Federal Rule of Civil Procedure 8 provides that illegality is an affirmative defense to be pled in the defendant's answer. *See* Fed. R. Civ. P. 8 ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . illegality . . . ."). And under California law, the validity, fairness and legality of private transactions are maxims of jurisprudence. *See* Cal. Civ. Code §§ 3545, 3548; *see also Mason v. Peaslee*, 343 P.2d 805, 808 (Cal. Ct. App. 1959) (holding that despite some evidence that the contract was invalid, "the presumption is that plaintiff acted lawfully . . . . [and] [t]he court . . . was obligated to give plaintiff the benefit of these presumptions and could not draw the inference that plaintiff's work . . . was done in contravention of [law]").

In the analogous situation of contract disputes, the party who asserts the illegality of a contract bears the burden of proof on that point. *See Wash. Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 477 (9th Cir. 1969) (applying California law and holding that because the alleged illegality of the contract was not evident from the face of the contract, "illegality is an affirmative defense and defendants[] have the burden of pleading and proof"); *Morey v. Paladini*, 203 P. 760, 762–63 (Cal. 1922) ("Any one sued upon a contract may set up a defense that it is a violation of an act of Congress, and if it is found to be so, that fact will constitute a good defense to the action. The burden ordinarily rests upon the

party asserting the invalidity of the contract to show how and why it is unlawful . . . ." (citation omitted)).[3]

Here, it is not at all clear that UMG (or any other entity) holds exclusive rights to the Marley Recordings, such that Rock River's attempt to distribute and license its Remixes would be an unlawful pursuit.  Although the lack of documentation may make it difficult for Rock River to support its position that its chain of licensing rights (from Lee Perry to San Juan to Rock River) is valid, its IIPEA claim cannot be defeated based on the *alleged* illegality of the expectancy unless UMG affirmatively establishes that illegality.

We also disagree with UMG's contention that Rock River had *no* evidence that San Juan received a nonexclusive oral license for the Three Tracks from Lee Perry.[4]  The district

---

[3] If the illegality of the business expectancy is readily apparent from the record or the undisputed facts, the proper placement of the burden will typically be of little import.  Indeed, in many of the cases UMG relies upon, the unlawfulness of the expectancy was either apparent or established. *See Renaissance Realty, Inc. v. Soriano*, 174 Cal. Rptr. 837, 839 (Cal. App. Dep't Super. Ct. 1981) (holding that the trial record *established* that the "economic relationship that was allegedly interfered with [was] . . . fraudulently conceived," and therefore could not form the basis of an IIPEA claim); *24/7 Records, Inc. v. Sony Music Entm't, Co.*, No. 03-CV-3204, 2004 WL 2093132, at *4 (S.D.N.Y. Sept. 20, 2004) (granting summary judgment on an IIPEA claim because it was "undisputed that [the plaintiff] did not have a negotiated license to use" the music recording at issue), *aff'd in part on other grounds and rev'd in part*, 429 F.3d 39 (2d Cir. 2005).  Here, by contrast, the validity of San Juan's licensing rights is a hotly contested issue.

[4] "[N]onexclusive licenses may be granted orally."  *Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 828 (9th Cir. 2001).

court properly excluded as hearsay the proffered testimony of San Juan president Michael Chernow.  But the affidavits from Lee Perry and San Juan's long history of openly licensing the Three Tracks provide at least some evidence that San Juan was authorized to license all the Recordings used on Rock River's album.  The Lee Perry affidavits attest to a licensing agreement and a "good relationship" between Perry and San Juan.  Although the Perry affidavits do not include the Three Tracks in their lists of recordings for which San Juan was given a license, the affidavits refer to "other recordings with Marley," which, read in the light most favorable to Rock River, could include the Three Tracks.  And San Juan has been openly licensing the Marley Recordings, including the Three Tracks, for 30 years.  During this time, San Juan has licensed one of the disputed Three Tracks, "Trenchtown Rock," to roughly 40 companies, including to divisions of UMG.  San Juan has never been sued for licensing the Three Tracks.

Between the Perry affidavits and San Juan's uninterrupted history of licensing the Three Tracks and accounting for them to Perry, Rock River has produced evidence from which a reasonable factfinder could conclude that Perry gave San Juan nonexclusive licensing rights for the Three Tracks.  Indeed, in light of the somewhat muddied history of licensing rights for the Recordings at issue, the history and course of conduct of the relevant players could be the most reliable evidence, particularly where the documents are inconclusive.

It has not yet been established that Rock River's album "Roots, Rock, Remixed" violated the exclusive licensing rights of UMG or any other entity.  And there remains a triable issue as to whether San Juan has licensing rights to all of the underlying Recordings or whether UMG has the

exclusive licensing rights to one or more of the Recordings.[5] We therefore remand Rock River's IIPEA claim for trial.

## B. *Noerr-Pennington* Doctrine

In the alternative, UMG argues that we should affirm the grant of summary judgment for a different reason: immunity under the *Noerr-Pennington* doctrine. The district court, however, found that triable issues of fact prevented summary adjudication of the *Noerr-Pennington* defense, and we agree.

Rock River's IIPEA claim seeks to hold UMG liable based on the cease-and-desist letters and threats of litigation UMG made to Rock River's business partners. Under the *Noerr-Pennington* doctrine, such pre-litigation material is immune from suit unless the threatened lawsuit was a "sham." *See Or. Natural Res. Council v. Mohla*, 944 F.2d 531, 534 (9th Cir. 1991); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939–40 (9th Cir. 2006). A "sham" lawsuit is one where the suit is both "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and "an attempt to interfere *directly* with the business relationship of a competitor through the use of the

---

[5] We agree with UMG, however, that if the factfinder concludes that Rock River lacked proper authorization for the Three Tracks, it cannot recover a prorated amount for the remaining nine tracks. The complaint does not allege, and Rock River has never presented evidence (even on summary judgment or in its motion for reconsideration), that if distribution of the complete album were blocked, it would have attempted to distribute the remaining portion of the album. The only evidence that Rock River had a business expectancy in one song independent of the others is the evidence of the plans to use one of the Remixes in the movie and soundtrack for "Dear John." But that song – "Lively Up Yourself" – is one of the Three Tracks.

governmental *process* – as opposed to the *outcome* of that process." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (alteration, citation and internal quotation marks omitted).

UMG contends that its cease-and-desist communications were made in good faith because UMG honestly believed it held exclusive licensing rights to the Recordings.  For support, it relies on its 2003 contract with JAD Records (JAD).  JAD, a record label that had an exclusive recording contract with Bob Marley in 1968, represented to UMG that it owned the rights to over 200 recordings by Bob Marley, including many of the same recordings to which Lee Perry claims ownership.  The 2003 contract purports to assign UMG exclusive licensing rights to JAD's music catalogue, including 10 of the Recordings used by Rock River on its album.  Thus, the 2003 contract arguably provides a good faith basis for UMG to believe that it held exclusive licensing rights to the Recordings.  If this were the only information known to UMG at the time it sent the cease-and-desist letters, *Noerr-Pennington* would shield the communications and threats of litigation.

During discovery, however, Rock River uncovered evidence that JAD's claim to exclusive ownership is tenuous and that UMG was acutely aware of the significant holes in its own chain of title both at the time of the 2003 deal and when it sent the cease-and-desist letters.  During the due diligence process leading to the execution of the 2003 contract, UMG consistently demanded, but was never provided, a chain of title evidencing JAD's claim of exclusive ownership to the Marley recordings.  At the same time UMG was doing due diligence on the 2003 contract, another UMG unit – Universal Music Canada – entered into two separate

licensing agreements *with San Juan* to license tracks over which JAD claimed exclusive rights, and UMG continued to account to San Juan for these licenses until 2008.  Perhaps most importantly, UMG knew of Lee Perry's competing claim to the recordings and acknowledged that the issue was unresolved.  An internal UMG email before the 2003 contract was finalized noted:

> Danny Simms [from JAD] . . . has approached us to do a deal for the JAD catalogue[,] the most substantive part of which is the 200 or so Marley titles. . . .  The complications are as follows: . . .  Lee Scratch Perry claims title to some of the recordings and has assigned them to Trojan and San Juan . . . .  Danny claims to have full right and title to deal with these recordings . . . .  However, I suspect there are competing interests and claims and that would have to be resolved before any deal for this catalogue could be viable.

The district court correctly determined that a reasonable jury, taking all the evidence in the light most favorable to Rock River, could conclude that when UMG sent the cease-and-desist letters, it knew it did not have exclusive licensing rights to the Recordings.  If so, UMG's litigation position was objectively baseless, satisfying the first prong of the "sham" exception to the *Noerr-Pennington* doctrine.  *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253–54 (9th Cir. 1982) (noting that whether the sham exception to the *Noerr-Pennington* doctrine applies is a question of fact and summary judgment on the defense is not appropriate where the facts are disputed).

Significantly, despite San Juan's long history of openly licensing the Marley Recordings, neither JAD nor UMG has ever sued San Juan or its licensees for infringement. To this day, UMG has still not initiated such a lawsuit, although several albums containing the tracks to which UMG claims exclusive rights remain available in the marketplace.[6] Viewed in the light most favorable to Rock River, UMG's transmission of cease-and-desist letters but failure to initiate litigation suggests that UMG is hoping to enforce its claim to exclusive licensing rights through the *threat* of litigation rather than through actual litigation. A reasonable jury could therefore conclude that UMG is attempting to achieve its aim through the litigation *process* rather than through the *result* of that process, satisfying the second criterion for the sham exception. *See Prof'l Real Estate Investors*, 508 U.S. at 60–61.

Because a reasonable jury could conclude that UMG's cease-and-desist communications satisfy both criteria of the sham exception, we cannot affirm the district court's grant of summary judgment to UMG on the alternative basis of *Noerr-Pennington* immunity. At trial, UMG can attempt to develop the facts necessary to support its *Noerr-Pennington* defense, but it has not done so for the purpose of summary judgment.

## C. Privilege

Rock River contends that UMG unjustifiably claimed attorney-client privilege over roughly 200 documents and that the district court should have either compelled their disclosure or at least conducted an *in camera* review to make

---

[6] Additionally, neither JAD nor UMG ever filed for copyright protection of the tracks recorded between 1969 and 1972.

an independent privilege determination.  We review de novo the district court's rulings on UMG's claims of attorney-client privilege, *see United States v. Gonzalez*, 669 F.3d 974, 977 (9th Cir. 2012), and we review for abuse of discretion the district court's decision not to conduct an *in camera* review of the documents, *see In re Grand Jury Subpoena 92-1*, 31 F.3d 826, 829 (9th Cir. 1994).

Rock River's belief that the documents are not privileged appears to be based on little more than unfounded suspicion, and the district court correctly concluded that Rock River had not made the requisite factual showing to justify an *in camera* review.  *See In re Grand Jury Investigation*, 974 F.2d 1068, 1075 (9th Cir. 1992) (requiring a "factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged").  The failure to conduct an *in camera* review was therefore not an abuse of discretion.

Rock River also claims that even if the documents were initially privileged, UMG implicitly waived the privilege by asserting a *Noerr-Pennington* defense.  A party who affirmatively places its attorney-client communications at issue in a litigation implicitly waives the privilege.  The attorney client privilege "may not be used both as a sword and shield."  *Chevron Corp. v. Penzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (holding that the defendant implicitly waived the attorney-client privilege because it relied on an advice-of-counsel defense).  But a *Noerr-Pennington* defense does not necessarily place the attorney-client communications at issue.  UMG has asserted the *Noerr-Pennington* defense, but it is Rock River that has alleged the sham exception.  It is only the sham exception that requires an inquiry into whether UMG sent the cease-and-desist letters in good faith.  We

therefore agree with the Fifth Circuit that a *Noerr-Pennington* defense, unlike an advice-of-counsel defense, does not implicitly waive privilege. *See In re Burlington Northern, Inc.*, 822 F.2d 518, 533 (5th Cir. 1987) ("We cannot accept the proposition that a defendant . . . who relies on the protection afforded by *Noerr-Pennington* necessarily gives up the right to keep his communications with his attorney confidential."). We affirm the district court's ruling that UMG did not implicitly waive privilege over its attorney-client communications.

## V.  Discretionary Denial of Costs

Because we reverse the district court's grant of summary judgment and remand for trial, we need not address UMG's cross-appeal contending that the district court's denial of costs was an abuse of discretion.

Rock River is awarded its costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART and REMANDED.**